TERRITORY OF DAKOTA, ON THE INFORMATION OF L. B. FRENCH, DISTRICT ATTORNEY, Plaintiff, v. COX ET AL., Defendants.

1. Constitutional Law — Executive Power — Office and Officer — Removal.

The power of removal from office is not judicial in the sense that it cannot be exercised by the executive, either with or without notice to the incumbent proceeded against.

2. Same.

Under the public examiners act, chap. 124, L. 1887, §§ 3, 4; Comp. L., §§ 119, 120, authorizing the examiner to "make an exhaustive examination of the books and accounts" of the public "institutions" of the territory, and "report to the governor the result of his examination," and providing that "the governor may cause the results of such examinations to be published, or, at his discretion, to take such action for the public security as the exigency demand," held, the governor, upon the receipt of an examination, had the power to remove from office the trustees (managing officers) of the public institution examined.

3. Same — Filling Vacancies.

Sec. 8, chap. 22, Pol. C., § 1392, authorizing the governor to fill "all vacancies" in territorial offices, is not in conflict with § 1858, R. S. U. S., which authorizes the governor of any territory to fill a vacancy in such office when it "happens from resignation or death," and the governor may, under the territorial statute, fill a vacancy occasioned by removal.

IN the district court, second judicial district, Yankton county, Dakota Territory.

*French & Smith* and *Gamble Bros.*, for plaintiff.

*Chas. F. Templeton, Attorney-General,* and *R. B. Tripp*, for defendants.

TRIPP, C. J. This is an action in the nature of *quo warranto*,

brought on the information of the district attorney of Yankton county, to oust the defendants, Robert Cox, Miles T. Woolley, W. Y. Quigley and F. A. Gale, from the office of trustees of the insane asylum located at Yankton, Dakota.

The defendants answer separately, and the plaintiff demurs to the answers of the defendants Cox and Woolley, which raises the questions of law presented to the court for determination. From the complaint and answers of the defendants Cox and Woolley, which, for the purpose of this hearing, are admitted to be true, it appears that B. S. Williams, William M. Powers, Frank L. Van Tassel, Martin J. Lewis and Charles H. Brown were, during the last session of the legislature of Dakota, appointed trustees of said asylum by the governor; that they were duly confirmed by the council, and that they qualified and entered upon the discharge of their duties on or about March 25, 1887. That subsequently and on or about September 30, 1888, said Lewis and Brown resigned, and the defendants Gale and Quigley were appointed by the governor to fill the vacancies occasioned by their resignation; that on or about the 30th of September, 1887, while an examination was pending before the public examiner of the district comprising said asylum, the governor suspended said Williams, Powers and Van Tassel from further performance of their duties as trustees, and that thereafter on the 2d day of November, 1887, upon the conclusion of such examination, he removed them from office, and appointed in the place of said Williams and Powers, the defendants Cox and Woolley. The demurrers to the answers of Cox and Woolley present substantially the same questions of fact in each case, and involve the same questions of law for the determination of the court. The questions of law raised by the demurrers may be divided into two propositions:

1. That there was no power in the governor to remove the trustees Williams, Powers and Van Tassel.

2. That if he had power to remove them, he had no power to appoint the defendants Cox and Woolley without the advice and consent of the council. The first proposition, to-wit: That the governor had no power to remove these trustees, the plaintiff bases upon two grounds:

1. That under our organic law the power of removal is judicial

and not executive, and that the legislature could not authorize the governor to exercise such power.

2. That the legislature has not authorized the exercise of such power, and that its acts do not admit of such construction.

I will consider these propositions in the order presented, though I may be unable to follow counsel over the entire field of inquiry entered upon by them in the learned discussion at the bar. The subject of constitutional law is a fruitful and tempting one when once entered upon in legal discussion or judicial inquiry. I shall content myself, however, with stating results which I deem pertinent to the determination of the question before me, and which I think are arrived at by the decisions of the highest courts of our country.

Is then the power of removal under our organic law judicial or executive? The school boy early learns that the government of our country is divided into three great departments — the executive, the legislative, and the judicial: and that each department is sovereign and independent of the other, but during his whole life, aided by the works of the best elementary writers and the decisions of the highest courts, he will be in frequent doubt as to which department some of the more commonly exercised powers of the government properly belong. And we are more in doubt from lack of precedent in the past. Our country was in many respects a new creation. It is even more unlike the republics it is supposed to have imitated than the monarchies it is presumed to have opposed. So it will be found that while in theory our government, in many of its fundamental theories, is exactly the opposite of the mother government, yet it will be found upon comparison that notwithstanding the extreme republican views of the framers of the constitution, and the bitter enmity existing against England and her people, we have not only copied into our jurisprudence the great body of her common law, but we have so framed our organic laws in consonance with the unwritten constitution of that government, that we are obliged continually to be governed by her political precedents and her judicial decisions. It is true that we have denied the divine right of kings, and that with us all ultimate sovereignty is in the people; yet when that sovereignty, whether derived from the people or the king, in the

foundation of government, state or nation becomes lodged in the executive, legislative or judicial department, its exercise is the same in either case, except so far as by grants and limitations of our written constitutions we have taken from one and added to the other of sovereign power. In England we have witnessed the entire executive and legislative exchange of sovereign power and the transition from absolute monarchy, when the bold barons of England wrested from King John the immortal magna charta, to the omnipotent parliament under Charles I, when the legislative overrode and absorbed all the judicial and the executive powers, and broke down the barriers which had guarded the royal prerogatives from the time of the Norman conquest.

The parliament of England still continues sovereign. Blackstone, in his time, gives the definition of sovereignty as follows: "By the sovereign power is meant the making of law, for whereever that power resides all others must conform to and be directed by it, whatever appearance the outward form and administration of the government may put on. For it is at any time in the option of the legislature to alter that form and administration by a new edict or rule, and to put the execution of the laws into whatever hands it pleases, by constituting one, or few, or many executive magistrates; and all the other powers of the state must obey the legislative power in the discharge of their several functions, or else the constitution is at an end." 1 Black. Com. 49.

In the creation of our government we have sought to distribute the sovereign power, to take from the legislative department, the judicial and executive, and to give to each of them sovereign powers separate and independent of each other, so that each may be a check, but without power to encroach upon the other. The theory is simple; the application of the theory is often difficult. Neither congress nor the legislature of a state can take from or confer upon either department, any power or functions not belonging to such department, except so far as it may be permitted so to do by the terms of the constitution itself. Hence, when the legislature has undertaken to confer upon the judiciary duties of a political or administrative character, such acts have been declared unconstitutional and void, as when under the congressional act of 1792, power was attempted to be conferred upon the courts

to determine what soldiers should be placed upon the pension list; the act was declared unconstitutional and void, in that the determination of who were, and who were not entitled to pensions, belonged to the administrative or executive department of the government. Marbury v. Madison, 1 Cranch, 171. And again, when it was sought to impose upon the courts the duty of determining the claims of the inhabitants of Florida for the injuries sustained on account of the American army, the courts held it was a matter not belonging to the judicial department, and that the legislation was unconstitutional and void. U. S. v. Ferreira, 13 How. 40. And in a recent case in Kansas, reported 1 Pac. Rep. 272, an appeal was undertaken to the district court from the decision of the board of county commissioners in setting off and organizing new townships under an act conferring such power upon them. Appeals were allowed in Kansas as in this territory, "from all decisions of the county commissioners." The Kansas court held that the term "all decisions" must be limited to decisions judicial, or *quasi* judicial, that such power of appeal could not be construed to include appeals from decisions of an executive or administrative character. And it is equally true that where judicial power has been sought to be conferred upon any officer of the executive department, such legislation, when not permitted by the express terms of the constitution, has been held null and void. In accordance with this well known principle, our supreme court in Spencer v. Sully County, 33 N. W. Rep. 97, held that the legislature could not confer upon the board of county commissioners the power to hear and determine claims of a judicial character against the county so as to bind the parties; that the judicial power of this territory was lodged in the courts expressly named in the organic act, and that while the board could audit accounts, and appeals might be taken from their decisions, yet their decisions were not so far judgments as to prevent claimants from suing upon their original causes of action. These are but illustrations of the rule that no power exists in the legislature to take from one department of the government and to bestow upon the others. The rule is plain in its terms, but to determine in each particular case what is judicial, legislative or executive "*hic labor hoc opus est.*"

What I have so far said applies to the government of the United States and to the government of the several states under their written constitutions. And this, although the constitutions of the states and the constitution of the United States are to be examined and construed from standpoints exactly opposite. The constitution of the United States is a grant of power, while the constitutions of the states are limitations of power. The state legislature has all power of legislation except so far as it is limited by the constitution; the congress has such powers of legislation as are expressly and by necessary implication conferred by the terms of the constitution. Cooley, Const. Lim. 207; Still v. Village, 15 N. Y. 297; People v. Galligard, 4 Mich. 244. Each is sovereign in its way, the one in the powers impliedly granted and not prohibited by the terms of the constitution, the other in the powers expressly granted and not impliedly prohibited by the terms of the grant; the former like all acts of limitation being strictly, and the latter like all grants of power being liberally construed. The national government has sovereign power over all the territories. Am. Ins. Co. v. Canter, 1 Pet. 511; Nat. Bank v. Yankton Co., 101 U. S. 132; Territory v. Scott, 3 Dak. 357. This power has never been denied, although courts have differed as to the particular section of the constitution which gives the power. It is sufficient for this discussion that the recognized power exists. Congress in the exercise of this power early created local self-governments out of its " outlying territory," denominated territorial governments, a name not found in the constitution itself, and it gave to these governments the usual executive, legislative and judicial powers. The organic acts of the several territories from the earliest history of the country have been of the same general character. They are framed after and founded upon the constitution of the United States itself, and are singularly like the early state constitutions, and the division into, and the separation of, the three great departments and the grants of powers thereto are much the same also, in character and distribution. The intention of congress to form a government is in terms expressed in the first section of our organic act, where, after giving the boundaries of the proposed territory, it concludes with the words " is organized into a temporary government by the name of the Territory of Dakota." It

has sometimes been said the territory is an " embryo state," and while the congress has never surrendered its right of supervision over the legislation of the territory, yet such power of congress has been very rarely exercised in the territories, and never perhaps in the history of this territory except upon direct application of her citizens to supply some omissions, or to relieve from some inadvertence of territorial legislation during the recess of the territorial assembly. The legislative grant to the territorial legislature is equal to, and, in some respects, greater than that allowed to many of the state legislatures, it extends " to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States," subject to the very few limitations enumerated in the grant, the grant of power to the executive and judicial departments is equally broad and comprehensive, so that in organizing the " temporary government," congress intended such government to have and exercise all the attributes of sovereignty " temporarily," subject only to such supervision as the congress shall choose from time to time to exercise over it. With this residuum of power remaining in congress, dormant except when expressly exercised, the government of the territory is sovereign in each department and its organic law is to be construed as its constitution, either in the light of a grant or a limitation of power, perhaps as to some portions it is to have the former, and as to others it is to have the latter construction. In Hornbuckle v. Toombs, 18 Wall. 655, Judge BRADLEY in speaking of territorial governments says : " As a general thing, subject to the general theme of local government chalked out by the organic act, and such special provisions as are contained therein, the local legislature has been intrusted with the enactment of the entire system of municipal law, subject also, however, to the right of congress to revise, alter, and revoke at its discretion. The powers thus exercised by the territorial legislature are nearly as extensive as those exercised by any state legislature." And in Clinton v. Englebrecht, Chief Justice WAITE, upon the same subject, says : " The theory upon which the various governments for portions of the territory of the United States have been organized, has ever been that of leaving to the inhabitants all the power of self-government consistent with the supremacy and supervision of the national authority, and with certain

fundamental principles established by congress." 13 Wall. 341.
Our district courts have in fact held the territorial governments
sovereign, and have denied to suitors the right of action against
the territory. Judge SHANNON so held after an elaborate argument
at the bar in the action of Harris v. Territory of Dakota, in which
the plaintiff brought suit for fees as codifier of the laws, and as
far as I am aware such has been the view of the courts generally.
If the territorial government is so far sovereign that its organic
act is subject to the same rules of construction as the constitutions
of the state and the national governments, let us proceed to in-
quire in the light of the construction given by the courts of the
several states under constitutional powers similar to our own
whether the power of removal, claimed by the executive, was a
judicial or an executive, one, and I may premise by saying that the
powers and jurisdictions of the great departments of the govern-
ment so often overlap, and like the colors of the rainbow so in-
terblend that the line of separation is often indiscernible even by
the judicial eye. Cooley, Const. Lim. 106; Fletcher v. Peck, 6 Cr.
136. Yet if the power be clearly judicial, it cannot, as already
shown, be conferred upon the executive, and any exercise of such
power by him would be a usurpation and his action illegal and
void. What then is judicial power? It is said to be " the power
to hear and determine," but this definition is too comprehensive;
every administrative and executive officer is required to hear and
determine many facts upon which his action is based. All the
political and executive departments of the government are re-
quired to pass upon controverted questions of fact, boards of can-
vassers, boards of equalization, boards of county commissioners,
and other administrative officers are continually passing upon
questions of the greatest moment to the citizen, involving the right
of office, the disbursement of the public revenue in the erection
of bridges and public buildings, and the opening of highways in
fixing the values of property and in levying and collecting of taxes,
often involving civil rights and sometimes, where the administra-
tion of the government is concerned, rights of persons and prop-
erty ; and while the determination of such questions involves judg-
ment and discretion and the examination of difficult and con-
troverted questions of fact, and while the decision of such admin-

istrative officer upon such hearings is final, yet his action is not judicial. In the case of State v. Hawkins, lately determined in the supreme court of Ohio, where the governor of that state had removed the police commissioners of Cincinnati, and it was urged that his action was illegal and void upon the ground that the power of removal was judicial and could not be conferred upon the executive, that court in an able review of the American authorities upon this question, holding that the power of removal is executive and not judicial, says: "The first claim is upon the assumed ground that the power conferred upon the governor by the statute to remove any of them for official misconduct is judicial in its nature, and, though conferred by the act, cannot be exercised as the judicial power of the state is, by section 1, art. 4, of the constitution conferred upon the courts of the state only. This is not to be regarded as an entirely new question. It has been much discussed by courts and writers without being able to formulate any general rule upon the subject. What is judicial power cannot be brought within ring fence of a definition. It is, undoubtedly, power to hear and determine; but this is not peculiar to the judicial office. Many of the acts of the administrative and executive officers involve the exercise of the same power. Boards for the equalization of taxes, of public works, of county commissioners, township trustees, judges of election, viewers of roads, all in one form or another, hear and determine questions in the exercise of their functions more or less directly affecting private as well as public rights. It may be safely conceded that power to hear and determine rights of property and of person between private parties is judicial, and can only be conferred on the courts. Merill v. Sherburne, 1 N. H. 199. But such a definition does not necessarily include this case. The incumbent of an office has not, under our system of government, any property in it. His right to exercise it is not based upon any contract or grant. It is conferred on him as a public trust, to be exercised for the benefit of the public." 5 N. E. Rep. 232. Such action by administrative or executive officers is not judicial in the sense that it belongs exclusively to the courts. It may be so far judicial that such an officer so exercising judgment and discretion in the determination of controverted ques-

tions of fact, may be protected in an erroneous determination of the matter before him, but not so far judicial that the subject-matter is cognizable by the courts only. All judicial power by the organic act, like the constitutions of the states and of the nation, is vested in the courts; a prohibition upon its exercise by the executive or legislative department, but the judicial power therein conferred upon and limited to the courts, is that judicial power which in the legal acceptation of the words can be exercised only by the court. It is the power which is confined to the courts by the words of limitation in the constitution itself, "that no person shall be deprived of life, liberty, or property, without due process of law." Art. 5, Amend. to the Const. In other words, the courts have exclusive power to hear and determine those matters which affect the life or liberty or the property of the citizen; all other rights, while they may be in a sense judicial, are not so far within the jurisdiction of the courts that their exercise by another department would be void. Is the right in controversy of that character? Does it affect the life, the liberty or the property of the citizen? Judged by this test, it is not a judicial power. It is a power often conferred upon the courts, and its exercise is highly judicial in its character; it often involves close and contested questions of fact, and nice and delicate discrimination in the application of law, but it is the subject-matter and not the procedure that determines jurisdiction. I have examined the cases with much care which have been collected and presented to me with commendable zeal and industry, and an examination of the cases here cited, without an attempt at review, discloses two distinct lines of authority, holding opposite and contradictory views upon this question we are discussing; though many of the cases may be distinguished as being based upon the peculiar phraseology of the provisions of the constitution construed. The authorities holding that removal from office is a judicial power and can be exercised. only by the courts are based upon the theory that an office is in the nature of a property right, and that the citizen can be deprived of it only by "due process of law," while the other line of decisions holds that under our form of government, there is no property in an office, that offices and officers are for the benefit of the people, and not for the benefit of the officers, and that whenever

the officer fails to perform the duties of the office, the office becomes forfeited, and that the only object of the examination necessary to determine such forfeiture is such as will establish the fact not to the satisfaction of, or for the benefit of, the incumbent, but to the satisfaction of the executive department which is charged with the execution of the laws, and that hence the removal may be summary, or upon such investigation as may be prescribed by the legislative department. The principal cases which hold the view that removal from office is a judicial and not an executive power are: Dullam v. Willson, 53 Mich. 392; Bowman v. Silfer, 25 Pa. St. 28; Page v. Hardin, 8 B. Mon. 672; State v. Pritchard, 36 N. J. L. 101. While among those maintaining the contrary doctrine may be cited: People v. Whitlock, 92 N. Y. 191; People v. Stout, 11 Abb. Pr. 17, 35 Barb. 254; State v. Doherty, 13 Am. Rep. (La.) 131; Wilcox v. People, 90 Ill. 186; People v. Mays, 7 N. E. Rep. 660; Donahue v. County, 100 Ill. 94; State v. Hawkins, 5 N. E. Rep. (Ohio) 228; Houseman v. Commonwealth, 100 Pa. St. 220; State v. Oleson, 18 N. W. Rep. (Neb.) 45; South v. Commonwealth, 5 S. W. Rep. 567; Smith v. Brown, 59 Cal. 672; People v. Hill, 7 id. 97; Attorney-General v. Brown, 1 Wis. 513; State v. McGarry, 21 id. 496; State v. Prince, 45 id. 610; Carland v. Board, 6 Pac. Rep. 24; Taft v. Adams, 3 Gray, 136; *Ex parte* Wiley, 54 Ala. 226; Keenan v. Perry, 24 Tex. 253; State v. Frazier, 48 Ga. 137; Dugan v. District (Col.), 22 Am. Law Reg. 528; Patton v. Voughan, 39 Ark. 211.

The court in State v. Hawkins, *supra*, reviewing the decisions which hold that the power to remove officers is judicial, says they " have, as a rule, proceeded upon the ground that an incumbent has property in his office, and that he cannot be deprived of his right without the judgment of a court. This view finds support in the doctrines of the common law, which regarded an office as a hereditament, but has no foundation whatever in a representative government like our own." And the court in Donahue v. Co. of Will, *supra*, says: " It is impossible to perceive how, under our form of government, a person can own or have title to a governmental office. Offices are created for the administration of public affairs. When a person is inducted into an office, he thereby be-

comes empowered to exercise its powers and perform its duties, not for his, but for the public benefit. It would be a misnomer and a perversion of terms to say that an incumbent owned an office, or had any title to it."

Some of the best jurists of our country have held that trials of impeachment are not an exercise of judicial powers, where the punishment extends only to removal from office, but are an exercise of the executive or administrative functions of the government, that belong to the political rather than to the legislative or judicial departments. Such was the view taken by no less distinguished lawyers than Senators Summer, Fessenden, Buckalaw and Garrett Davis, upon the impeachment of Andrew Johnson. (See Opinions, Cong. Globe.)

Without stopping to notice further the learned arguments and reasonings of the courts, I am content to say that in my judgment, those decisions which hold the power of removal to be executive in its nature, are more in harmony with our age and our form of government. The right of removal always existed unquestioned in the king even after the encroachments of parliament; and while in adopting the common law of England we did not adopt the form of government to which it applied, yet in defining the words, "judicial, legislative and executive," which are found in our written and common law, we may safely have recourse to the source from which they are derived to aid us in determining their present meaning. And if the officer may be removed by the executive, he may be removed either with or without notice and hearing, as the legislature have chosen to provide or as the terms of the constitution may require. Our organic law is silent upon this subject, and it follows that if power of removal in this case is given to the governor, with no notice or hearing provided, he would be at liberty to remove summarily upon the occurrence of such an event, as may be prescribed by statute.

Secondly—It is further urged by the plaintiff that the act under which the executive claimed to remove these trustees does not confer such authority in terms nor by fair implication. The act is found in the laws of 1887, chap. 124, relating to public examiners. The act is somewhat lengthy and need not be given in full. Sections 1 and 2 provide for the division of the territory

into two examiner districts, and for the appointment by the governor, with the advice and consent of the council, of the public examiner in each district, and for his removal by the governor, for violation of duty. Sections 3 and 4 are as follows:

Section 3. "It shall be the duty of said public examiners authorized and empowered by this act, in their discretion to assume and exercise a constant supervision over the books and financial accounts of the several public, educational, charitable, penal and reformatory institutions belonging to the territory, and within said examiner's district. Each examiner shall prescribe and enforce correct methods of keeping financial accounts of said institutions, by himself or duly appointed deputy, and instruct the proper officers thereof in the due performance of their duties concerning the same. It shall be the examiner's duty to visit each of the said territorial institutions within his district, by himself or duly appointed deputy, at irregular periods, without previous notice to the officers thereof, at least twice each year, and make an exhaustive examination of the books and accounts thereof, including a thorough inspection of the purpose and detailed items of expenditure, and the vouchers therefor."

Section 4. "It shall be the duty of the said examiners to order and enforce a correct and as far as practicable, uniform system of book-keeping, by territorial and county treasurers and auditors so as to afford a suitable check upon their mutual action, and insure the thorough supervision and safety of the territorial and county funds. They shall have full authority to expose false and erroneous systems of accounting, and when necessary, instruct, or cause to be instructed, territorial and county officers in the proper mode of keeping the same. It shall be their duty to ascertain the character and financial standing of all present and proposed bondsmen of territorial and county officers within their districts. Each examiner shall require of county treasurers within his district, from time to time, as often as he shall deem necessary, a verified statement of their accounts, and he shall personally or by duly appointed deputy, visit said office, without previous notice to such treasurers, at irregular periods of at least once a year, or when requested by any board of county commissioners, and make a thorough examination of the books, accounts and vouchers of such officers,

ascertaining in detail the various items of receipts and expenditures; and it shall be his duty to inspect and verify the character and amount of any and all assets and securities held by said officers in public account, and to ascertain the character and amount of any commissions, percentages, or charges for services exacted by such officers without warrant of law. Each examiner shall report to the attorney-general the refusal or neglect of county officers to obey his instructions, and it shall be the duty of the said attorney-general to promptly take action to enforce compliance therewith. The said examiner shall report to the governor the result of his examination, which shall be filed in the executive office, as well as any failure of duty by financial officers, as often as he thinks required by public interests, and the governor may cause the results of such examinations to be published, or, at his discretion, to take such action for the public security as the exigency may demand; and, if he should deem the public interests to require, he may suspend any such officer from further performance of duty until an examination be had, or such security obtained as may be demanded for the prompt protection of the public funds."

Section 5 provides for the examination of banking and other private moneyed corporations; and the remaining sections of the act provide the procedure and means of obtaining testimony at the examinations and prescribes penalties for disobedience, etc.

The act itself is unique and establishes a complete system of supervision over the public institutions of the territory, and of its financial agents. Sections 3 and 4 above quoted contain all the powers of the examiners, except the last section of the act, which provides that it shall be the duty of the attorney-general to assist the examiners when called upon by them to do so. The portion of the act relied upon by the executive as providing for removal is at the close of section 4, and is contained in the words: "And the governor may cause the results of such examination to be published, or, at his discretion, to take such action for the public security as the exigency may demand."

The plaintiff contends: 1. That these words apply only to section 4 and not to section 3. 2. That the words do not give any power of removal to the governor. In the construction of statutes the entire act will be taken together, and such meaning will be

given to it as from the entire context it is evident the legislature intended it to have. In looking at section 3 it will be observed that the examiner is given "a constant supervision over the books and financial accounts" of this asylum, and "at least twice a year he is required to make an exhaustive examination of the books and accounts thereof, including a thorough inspection of the purposes and detailed items of expenditure and the vouchers thereof." Here the section closes; no provision is made as to what is to be done with the results of such examination, but in section 4, after detailing the examiner's powers over the territorial and county auditors and treasurers, it is provided without any limitation of the words to the examination of the last officers named, that "the examiner shall report the result of his examina, tion to the governor, which shall be filed in the executive office," and that thereupon the governor may proceed as above quoted. Why is it required that the examination made should be filed with the governor in the case of the treasurers and auditors, and not in the case of the territorial public institutions? The examinations provided for are as rigid in case of the public institutions, and the examiner is given greater powers, since he is permitted to inquire into the "purpose" of the items of expenditure, reaching to not only the system of book-keeping and the honesty of the superintendent and steward as financial agents, but the entire management of the institution; while in case of auditors and treasurers he is only required to examine into the honesty of their official transactions, and the correctness of their accounts as auditors or treasurers and not into the fiscal affairs of the counties or territory. The examiner is also required to make an examination of the territorial institutions at least twice a year, while in case of auditors and treasurers he is not required to make an examination but once a year. If there is any importance at all to be attached to the filing of such examinations with the governor, and making reports to him it would seem to obtain with as much force in favor of the examination of the public institutions as that of the treasurers and auditors. The people are as much and as directly interested in the proper conduct and management of the territorial institutions, and that the public funds should be as safely and honestly accounted for by them, as by the auditors and treasurers

of the various counties of the territory. But there are other words of this section which throw light upon its construction. The provision including the words already given, reads : " The said examiner shall report to the governor the result of his examination, which shall be filed in the executive office, as well as any failure of duty by financial officers, as often as he thinks required by public interests." What is meant by the words, " as well as any failure of duty by financial officers as' often as he thinks required by public interests ? " Why are the words " financial officers " used if the examinations required to be filed were the examinations of financial officers only ? In other words, if the term " financial officers " shall be held to include 'auditors, treasurers and such officers as have especial charge of finance proper, as I am inclined to think it should, and the examinations required to be filed with the governor were the examinations of such officers, as is contended for by plaintiff, would it not have been the natural statement of the section, after providing for the filing of such examination, to have continued " as well as any failure of duty by such officers ? " or in other words, why repeat " financial officers," if those of whom he had last been speaking were financial officers only ? It is plain to my mind that the clause as to filing examinations with the governor was intended to apply both to the examination of the public institutions, and to an examination of the auditors and treasurers. It is no unusual thing in legislation to make a provision refer to more than one independent preceding clause. If the two sections had been one, the construction would have been comparatively easy, but sections as well as punctuation marks are often the work of an engrossing clerk and sometimes of the printer ; and courts do not heed the latter, and will so arrange the former as to give the intended meaning. Our supreme court in Brown Co. v. Aberdeen, determined at the October Term, 1886, took the proviso away from the second section, to which it was appended, and appended it to the first section of the act, it being plain from the context that it was intended to modify the first and not the second section. It requires a far less transposition here where it is evident that the clause is intended to modify both preceding sections. And what has been said as to filing such examination with the governor applies with its full

force to the action of the governor upon such examination. He may, upon the filing of such examination, " cause the results to be published, or, at his discretion, take such action for the public security, as the exigency may demand." It follows that if the examination to be filed with him, is both the examination of the territorial institutions and of the auditors and treasurers, that he may exercise such power as is here given upon the persons whose examination is so filed with him. What power is he permitted to exercise by these words? It is evidently intended to confer upon the executive discretion; it expressly says so, and the discretion is unlimited by the words which follow; but he is " at his discretion to take such action as the exigency demands." He is made sole judge of the exigency, and what action he will take; what power was intended by these words to allow the executive to exercise? There must be a limit somewhere; it could not have been intended to authorize him to fine or imprison these recusant officers; such attempted exercise of judicial power would not only be a violation of fundamental law, but would shock the layman's view of justice and of right. These words must, however, have some meaning if it is possible for the courts to give them such construction. Dwarris, Statutes; Domat's Rules. The plaintiff says they mean that the governor is given a choice of remedies provided by the statute for the punishment and removal of offenders. This would be giving to the words a redundant force, for the executive as well as any other citizen may set the machinery of the courts in motion for the punishment of any offender; but upon examination of the statutes I am unable to find any provision by which the governor may take any step for the removal from office, or for the punishment of such offenders. By chap. 1, title 3 of the C. Cr. Proc., it is provided that the grand jury may present an accusation in writing against territorial, county and municipal officers for misconduct in office, and issues may be formed by answer of the defendant to such accusation, and tried to a jury of the county where such officer resides; and upon conviction, judgment of removal may be entered, but the grand jury have the control of initiating such a proceeding; the governor has no more power over such a proceeding than a private citizen; and the same is true of any other criminal or civil pros-

ecution of such officer for default or misconduct in office. Our statutes are entirely silent as to any power conferred upon the governor that any private citizen does not possess. The words must then be regarded as redundant, and as not conferring upon or not authorizing the governor to exercise any power, unless the court can give them some other force and meaning. It was evidently the intention of the legislature to authorize the governor to exercise all such power as it was competent for him to exercise under any legislation which it had power to enact. If it did not authorize him to exercise the power of removal, it conferred upon him no power, for there is no other executive or administrative power it could authorize him to exercise. It could not confer upon him any power of punishment, for any power which went beyond the office itself, and pertained to the incumbent himself, would be judicial and incapable of exercise by the executive; but the legislature could confer upon or rather it could permit the governor to exercise any administrative or executive power. I say permit him to exercise, for properly speaking the legislature could confer no power; the only power given our legislature is legislative power, which can never be delegated. Cooley, Const. Lim. 207. Nor can the legislature confer upon the executive, legislative or administrative power; such power must have existed in him by virtue of the organic act itself as one of those dormant powers requiring the act of the legislature to bring it into action, and to regulate and control its use. That this power of removal is an executive one, and that it may properly be left with the governor or other executive officer of the territorry, I have no doubt; but whether it was the intention of the legislature to authorize, and whether it has authorized the use of such power by the executive, I have some doubt. I am disposed, however, to give the words the natural meaning they would have in the light of the accompanying legislation, and the object sought to be attained by such enactment. That these words could have no other meaning than removal, we have already seen. Did the legislature intend to give these words such meaning? It must be presumed that they were intended to have some meaning and that they were not intended by the legislature to be rejected as redundant; and in replying to argument of counsel that the legislature could never

have intended to place such power in the hands of the executive, it is sufficient to say that the examination of the statutes of the different states will reveal the fact that in almost all, such a provision will be found either in their constitution or statutes; and in Minnesota, the state from which this statute was taken, almost in *haec verba* there is an express statute permitting the governor, not only to remove the financial officers of a county, but the county commissioners and other administrative officers. But a better and stronger evidence of the intention of the legislature exists in the amendment of this act itself and other concurrent acts of the same session. By chap. 125, two days after the passage of this examiners act, the legislature passed an amendatory act giving the governor absolute power of removal of the examiners themselves, whenever " they fail to faithfully discharge the duties of their office," and an examination of the legislation of that entire session, so far as I have been able to make it, reveals the fact that every office created by it to be filled by appointment of the governor, it has provided also for removal therefrom by the governor. It is provided in the new school law that he may remove the superintendent and both assistants. § 1691, Comp. Laws.

He may remove the commissioner of immigration. § 110, Comp. Laws. He may remove the veterinary surgeon. § 2333, Comp. Laws. He may remove all the military officers. § 1922, Comp. Laws. The court is not only permitted, in giving construction to statutes, to look at all other statutes of the same legislature to see what of such powers it had also otherwise granted, but it may trace the history of the act and inquire of its construction by the tribunals that have put it into execution. I am informed by those presumed to be familiar with the workings of this statute in Minnesota, where it had been in force since 1878, that the executive of that state has construed it to have the same force and effect as claimed for it by the executive of this territory, and that unchallenged by parties interested, for it does not seem to have been brought before the courts for their construction. The concluding words of section 4 should not be overlooked however ; it is there provided that the governor, pending an examination, may suspend the officer from duty ; it is contended by the plaintiff that these words represent the maximum of the governor's

power; that he may exercise any power given by the statute even to the extent of suspending the offending officer, but I cannot agree with this construction. The suspension is an intermediate not a final act; it is given to prevent a failure of administration or loss of the benefits to be derived from removal, by allowing a dishonest officer, after notice of an examination pending, to hold possession of the office and make way with the public funds, or cover up his corrupt misconduct. And under such interpretation, the absurdity of the provision for suspension in its final result, is apparent; the provision for suspension is pending the examination; he can only be suspended " until an examination be had or security be given." It is not until an examination can be had in the courts; not until his case can be presented to a grand jury; but until the examination is had by the examiner; then, when an examination is had, when it is completed and filed, *eo instanti*, under the construction of the plaintiff that the governor cannot remove, he must, no matter however guilty the examination proves him, be reinstated in office. The construction leads to the absurd conclusion that the governor is authorized to suspend upon suspicion, but cannot remove upon a case proved. I am constrained after much study and with some hesitation to adopt the construction that the legislature intended to authorize the governor to exercise all and every of his executive power in enforcing this examiners act. The whole act is meaningless and a farce without such construction; an idle examination, the result of which cannot even be used as evidence in a court of justice, and no method even for its preservation under the construction contended for by the plaintiff. I have nothing to do with the propriety or impropriety of the act itself, whether it is a wise or an unwise law; that was a matter for the legislature, and if in its construction by the courts it is found unwise, a future legislature can repeal it. It has been wisely said that " the best way to get rid of a bad law is to enforce it." In any event it is not the duty of the courts to make or revise legislation; they are kept sufficiently employed to give construction and meaning to laws already made. Under this view the governor would have and exercise all and every executive power conferred upon him under the organic law, to the same extent as if the legislature had expressly

enumerated all his powers, and then said he might in the execution of this law have and exercise any or all of said enumerated powers. Clearly the executive can get no powers from the legislature, and its enumeration of such powers could not confer them. Then why, when the legislature has given him the discretion of exercising his executive powers, has he not the same power to remove as he would have if the legislature had enumerated that power in the providing for the execution of the law? There is no difference in effect between the governor's exercising the power of removal under the discretion conferred by the statute, and his exercising the power of removal under the statute conferring it specifically. And the only difference is in the comprehensiveness of the terms of the statute and not in its results.

Again it is the duty of the court to give this statute, which is one addressed to the executive department, the same construction it has received from the officer executing it, if it can be done without violence to the language of the act. The judicial department, like the other department, while it has jurisdiction to supervise and pass upon their acts so far as they are in violation of the organic law, yet it is the duty of the court in case of doubt as to the constitutionality of legislation, or violating of fundamental law by executive construction, to give the benefit of such doubt in favor of the construction adopted by the department itself.

In reference to treaty stipulations and matters belonging to the political department of the government, it is the settled rule of the courts to follow the decisions of the executive and the political branches of the government, whose more especial duty it is to determine such affairs. U. S. v. Holliday, 3 Wall. 419; U. S. v. Regnes, 9 How. 154; Foster v. Nielson, 2 Pet. 253; Garcia v. Lee, 12 Pet. 511; Luther v. Borden, 7 How. 35; State v. Stanton, 6 Wall. 50; State v. Johns, 4 id. 475; Worcester v. State, 6 Pet. 560. Our own supreme court adopts this rule in Uhlig v. Garrison, 2 Dak. 96, where it follows the construction of the Indian treaty of 1868, given to it by the executive departments at Washington. It is only where there is a plain and clear misconstruction of the terms and meaning of the act by the executive departments that the courts will interfere; and while there exists

some doubt as to the force and effect to be given to the language of the act before me, I do not think the doubt is of the character that calls upon me to reverse the action of the executive and to give a contrary construction to it from that which it has received from the co-ordinate branch of the government first called upon to construe its meaning. In passing it might be well to say that I do not feel called upon to pass upon the question urged at the argument as to whether the governor has power without statute to remove territorial officers appointed by him. I do not consider it necessary to review the decisions of congress and the courts by which that principle has finally obtained in favor of the executive of the nation under the constitution, nor to review the conflicting decisions of the state courts to trace the analogy between the national and the state governments in which the principle has been both affirmed and denied. I content myself with the result. I have announced that by the weight of judicial authority in our country the power of removal is essentially executive and not judicial, and that however far it may be controlled by legislative action in determining the agent by whom and the manner in which it shall be exercised, it is sufficient for the determination of this case that the legislature has spoken, and by its words the governor was authorized to make the removals complained of.

Third. I now come to the last proposition of the three, and one upon which much stress was laid at the argument, to-wit: That though the governor have power of removal he has no power of filling vacancies occasioned by such removal, except by and with the consent of the council. The plaintiff contends that the organic act has pointed out the way in which appointments are to be made and what vacancies can be filled by the governor alone; and it having stated the manner of appointment and enumerated the cases in which the governor alone can fill vacancies, such statements and enumerations are exclusive and the legislature can prescribe no others. This as a general proposition is true of constitutional legislation; that where the constitution has spoken, such utterances are exclusive; and that upon a given subject-matter, the expression of one thing is the exclusion of all others, and this rule has been adhered to very rigorously by our supreme court. See Territory v. Briggs, 1 Dak. 302; Harris M. Co. v. Walsh, 2

id. 41. And perhaps even the border line was crossed in the latter case; but I think I shall be able to distinguish the case at bar without violations of the established rule. Sections 1857 and 1858 of the United States Revised Statutes upon which plaintiff relies, read as follows:

Section 1857. "All township, district, and county officers, excepting justices of the peace and general officers of the militia, shall be appointed or elected in such manner as may be provided by the governor and legislative assembly of each territory; and all other officers not herein otherwise provided for, the governor shall nominate, and by and with the advice and consent of the legislative council of each territory, shall appoint; but, in the first instance, where a new territory is hereafter created by congress, the governor alone may appoint all the officers referred to in this and the preceding section and assign them to their respective townships, districts, and counties; and the officers so appointed shall hold their offices until the end of the first session of the legislative assembly."

Section 1858. "In any of the territories, whenever a vacancy happens from resignation or death, during the recess of the legislative council, in any office which, under the organic act of any territory, is to be filled by appointment of the governor, by and with the advice and the consent of the council, the governor shall fill such vacancy by granting a commission, which shall expire at the end of the next session of the legislative council."

Section 1857, it will be observed, prescribes for the filling of all township, districts and county offices by election or appointment and for the filling of all territorial offices by appointment of the governor with the advice and consent of the council, with one exception, in which the governor, in the first instance, may alone appoint, and under section 1858 the congress has given to the territories the right to fill vacancies during the recess of the council in two cases only, to-wit, the death or resignation of the incumbent. Plaintiff contends that these two sections are grants of power to the governor to appoint, and that the only power he has, or can exercise, as to appointments was given him by these sections. Section 1857 was enacted in 1861 (so far as this territory was concerned), and that under it the governor could only appoint by and with the

consent of the council, and that after the enactment of section 1858, in 1872, he could by that grant of power fill vacancies in the two cases therein specified only. If the premises of the plaintiff are correct that these two sections are to be construed as grants of power, and that they contain all the power of appointment that the executive of this territory has, or can exercise, the result contended for would seem to follow; but under the view I have taken, the powers of appointment and removal are executive powers conferred upon the governor by the organic act vesting in him the executive powers of the territorial government subject to legislative control as to time and manner of exercise, etc. It is too well settled to need citation of authority that all matters of appointment and removal, except so far as legislation has been had in the constitution itself, is a proper subject of legislation by the legislative department of the government, but how far the legislature may go in controlling the action of the executive by legislative enactment is by no means clear; the omnipotent power of our own legislative bodies so often asserts itself that courts hesitate often in drawing the boundary line of their power. Says Chief Justice MARSHALL in Fletcher v. Peck, 6 Cranch, 136 : "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments. How far the power of giving the law may involve every other power in cases where the constitution is silent never has been and perhaps never can be definitely stated." It is sufficient for our present purpose that it is conceded that the field so far as it is clear of constitutional or organic legislation is open to state and territorial legislation. Our legislature is vested with power of legislation as we have seen more ample than most state legislatures; that power is extended to "all rightful subjects of legislation not inconsistent with the constitution and the laws of the United States." § 1851, U. S. R. S. That this is a rightful subject of legislation is conceded. It remains only to ascertain whether it be in conflict with the constitution or any law of the United States; to be "inconsistent with any law means inconsistent with any law then or thereafter existing in a subsequent section of the same or of a subsequent act; in other words, the organic act gave to the

legislature full power to legislate upon all rightful subjects of legislation except as congress in the same act or existing acts had or thereafter by subsequent acts, should limit such legislative power. Under such interpretation, which seems to me to be the only reasonable one, section 1857 contained in the organic act of 1861, must be construed as a limitation upon the legislative power contained in section 1851 and upon the executive power contained in section 1841 of that same act, and not as a grant of power, and should, therefore, receive a strict rather than a liberal construction. As a limitation of power, was it intended that the governor should in all cases make appointments only with the advice and consent of the council? The same organic act of 1861 limited the session of the council to forty days, and it must have been presumed to know what has been several times held by the departments and the courts, that the session of the council was at an end at the expiration of that time, that it was extinct, and could not be reassembled by order of the executive or otherwise; and is it to be presumed that congress intended by giving the executive power to appoint by and with the advice and consent of the council, to prohibit the legislature from providing for vacancies occurring after the session of the council had ended? Is it not more reasonable to hold that the section was intended to apply to appointments made for the full term during the session of the legislative assembly, and would a legislative enactment providing for such vacancies be inconsistent with it? Our legislature enacted as early as 1877 a law giving the governor the power of filling all vacancies occurring in the territorial offices. Such statute has remained upon our statute books unchallenged to the present time (§ 1392, Compiled Laws), and it is safe to say that some such statute will be found in the legislative enactment of every territory. The length of time that it has remained upon our statute books gives it an implied sanction of congress. Says the supreme court of the United States in Clinton v. Englbrecht, 13 Wall. 434 : " In the first place we observe that the law has received implied sanction of congress. It was adopted in 1859. It has been upon the statute book for more than twelve years. It must have been transmitted to congress soon after it was enacted, for it was the duty of the secretary of the territory to transmit to

that body copies of all laws, on or before the first of the next December in each year. The simple disapproval of congress at any time would have annulled it. It was no unreasonable inference, therefore, that it was approved by that body." It would in my judgment be a very strict construction of this section to hold that congress intended to leave this and other territories with no power of filling vacancies during the recess of the legislative council; that no matter how soon after the adjournment of the legislature or in how many of the territorial offices the vacancies occurred, there was intended to be no power of filling such offices until the next legislature should meet, and that nearly two years might elapse with an entire suspension of some or all of the executive functions of that department, unless aid could be had through the tardy action of congress itself. Upon a hasty examination of the decisions of the states where similar provisions of the constitution obtain, I am strengthened in the view I have taken of this question. In New York, under their constitution it was provided that " Sheriffs and clerks of courts shall be designated by the electors of the respective counties once in every three years, and as often as vacancies shall happen." (Art 4, § 8.) The legislature enacted a law providing for filling vacancies by the governor to hold until the next general election, when the vacancies should be filled by election, and this same question was there raised to the court, that the constitution had spoken and the legislature must be silent; that the constitution itself having provided for filling vacancies, that method was exclusive; but the supreme court of New York denying the proposition and sustaining the validity of the law, speaking through Judge BRONSON, says: " But I feel no great difficulty in saying that the law is valid. There must of necessity be an interval between the death, resignation or removal of the incumbent and the filling of the vacancy by the electors; and it is essential to the public welfare that some person should in the meantime discharge the duties of the office. The legislature has provided that the vacancy shall be supplied by the people at the next general election after it happens (1 R. S. 128, § 8) and that in the meantime the duties of the office shall be discharged either by the deputy or by a person appointed by the governor, or by both of them. This space in which the office may

not be filled by election can never exceed one year, and may sometimes amount only to a few days. How long it may happen to be, provided it does not extend beyond the next annual election, is a question, I think, fairly within the discretion of the legislature. The language of the constitution is not, that the office shall be filled by election in every possible case, nor that a vacancy shall be supplied in that manner as soon as it happens; but the language is, that vacancies shall be supplied by election as often as they happen; that end is fairly attained by referring the matter to the people at the next stated period for exercising the elective franchise." People v. Fisher, 24 Wend. 219. The same question came before the court of appeals in People v. Snedeker, 14 N. Y. 52, in which Judge Denio, delivering the opinion of the court and quoting the above language of Judge Bronson and affirming the doctrine of that case, says: " This view is so reasonable as to command the assent of every person." The same question arose in Wisconsin where the constitution makes provision for the election of sheriffs, and no provision is made for the appointment by the governor in any case. The case seems to have been one of first impression, and the court without reference to New York, or other decisions, arrives at the same conclusion and gives the same reason and uses language similar to that of Judge Bronson. " Moreover, we are clearly of the opinion that the statute which authorizes the governor to appoint some suitable person to perform the duties of sheriff for the time being, when there is no officer duly authorized to perform the same, is a valid law, notwithstanding the constitution, art. 101, § 4, provides that the sheriff shall be chosen by electors, and fails to confer the power of appointment on the governor in any case. It would be too strict a construction of the constitution that in cases where it is silent the legislature has no power to provide against the entire suspension of the functions of any public office, when the office has become vacant, and there is no officer authorized by law to perform these functions. Such a construction would be intolerable; and we cannot believe that it was contemplated by the convention which formed, or the people who adopted the constitution." Sprague v. Brown, 40 Wis. 612. In Minnesota, § 1, art. 11, their constitution declares that " provision shall be made by law for the election of

such county or township officers as may be necessary." The courts say : " Under this section it is claimed that county offices can be filled only by election, and that the appointment of county officers, under any circumstance, is forbidden. This construction would prevent a vacancy from being filled by appointment for a length of time which would necessarily intervene between the occurrence of the vacancy and the first succeeding general election, or even an especial election ; certainly this would work great public as well as private inconvenience and injury, and in our judgment the constitution framed as it was for practical purposes, need not, and should not receive a construction so narrow, and the fact that many provisions of our statutes, in reference to filling vacant offices by appointment have been framed in accordance with this view of the constitution, and have been acted upon for years, is entitled to great weight as legislative and practical construction." State v. Benedict, 15 Minn. 158. See also 17 Pa. St. 118; 21 Iowa, 540; 18 Wall. 317; 1 Pet. 511. These decisions to my mind are based upon correct reasoning and are decisive of the question we are now considering. The legislature of the territory in providing for filling vacancies is not legislating in conflict with section 1857. The test is in this case as in all others, is the legislation inconsistent with the congressional enactment; if it is not, it is valid ; if it is, it is invalid. Giving to section 1857 the construction that it was intended to apply to appointments made for the full term during the session of the legislature, and not to vacancies occurring during the recess, the legislation of the territory supplements it, and supplies an omission that might otherwise cause great inconvenience and injury. But it is urged that section 1858 has enumerated the cases in which the vacancies can be filled and it must be conclusive. The same arguments apply to this section as we have already applied to 1857, but it is further to be noted in reference to this section, that it was not enacted until 1872, more than ten years after our sovereign existence had begun. It was enacted by congress by virtue of its reserved power to legislate direct for the territories. National Bank v. Yankton, 101 U. S. 455. It contains no express repeal of existing enactments, and cannot be construed as repealing existing laws, or as prohibiting further legislation except as they may be

in conflict therewith. This enactment has a history. In 1872 the supreme court of Montana held (Territory v. Potts, 1 Mon. 252), that, under the organic act and her statute as it then existed, which provided in express terms for filling vacancies by the governor with the advice and consent of the council, the governor alone could not fill vacancies, and a death of one of the territorial officers having occurred during a recess of the council, the delegate from Montana got this act through congress, general in its character as such acts usually are, for the special benefit of Montana. The act was in aid, not in restraint of legislation; that congress had power to pass the act is not denied; that it was intended to limit legislation in the sense that no other legislation coud be had by the territorial legislature upon the subject of vacancies, is denied. The section must be construed as a limitation only upon the general power of the legislature in that it takes away from the legislature the power to fill vacancies in the two cases mentioned in any other way than by appointment of the governor. Congress by its enactment in this as in other cases has given in the organic acts all the sovereign power necessary to make independent governments. These acts of creation or organic laws, are constitutions that give all the powers that congress has to give them, and subsequent acts are not as a rule grants of power but legislation to correct legislation of the territory or to supply some omission of territorial legislation, and in that light such congressional acts may be supplemented and filled out like existing acts of the legislature itself, subject only to the restriction that no part of the congressional enactment can be changed or impaired and the supplement or amendment must not be inconsistent therewith. Guided by this rule the legislative enactment for filling vacancies is supplementary of section 1858 and is not inconsistent with it; it simply adds other cases of vacancy to those of 1858 which may be filled by the governor. I am aware of a different view taken by the court of New Mexico in Territory v. Stokes, where two persons, both claimed to be attorney-general, and insisted upon representing the people. The authorities do not appear to have been reviewed or examined with much care, and the decision seems to have been received with so little favor at home, and was regarded as of such doubtful authority

that the governor several years thereafter during the recess of the council, removed the attorney-general and appointed another in his place and the supreme court declining to pass upon the legality of the appointment because a proper case was not before them, takes occasion to say of that case "that decision stands as the declared law, and we are bound to respect it until overruled or modified in a regular proceeding," language generally used by courts to intimate a doubt of the correctness of the ruling, and an intimation that the court would at least be willing to review its former decision. *In Re* Attorney-General, 9 Pac. Rep. 249, and later, the same judges in Territory v. Ashenfelter, 12 Pac. Rep. 879, refer to this statute allowing the governor to appoint and fill vacancies during the recess of the council, for other causes than death or resignation, and consider it as in full force, giving it construction as applied to the case under consideration. I do not care to discuss the peculiar complications that existed in that territory, and which may to some extent have influenced the decisions of her courts. It is sufficient to say that I prefer to adopt the rule announced by the learned courts of New York, Wisconsin and Minnesota as more in accordance with congressional license and the exigencies of territorial legislation. This same question has recently come before the supreme court of Utah, and the court arrived at a conclusion exactly opposite to that arrived at by the New Mexico court. The governor appointed an auditor during the recess of the council, in place of such officer claimed to have been elected by the people, and the case was presented by the ablest attorneys at the bar, and the court upon the question as to the governor's right to appoint without the advice and consent of the council, in cases other than death and resignation says: "There being a vacancy in the office I think there can be no doubt but that the governor was authorized to fill the same by appointment. It is provided by § 8, act of 1852 that, 'vacancies may be filled by executive appointment in the foregoing or any office when the mode of supplying vacancies is not prescribed by law. Nothing can be plainer than the foregoing, and the act of the governor in making the appointment was clearly within his power, and strictly within his duties. If he had omitted to make the appointment he would have failed to have done his duty; he simply

did that which the law required him to do." People v. Clayton, 11 Pac. Rep. 211.

Upon a careful review of all the authorities presented upon the argument of this case and all those which I have examined since its submission, I am of the opinion that the demurrer should be overruled. Let the order be entered accordingly.