STATE *ex rel* R. M. POLLOCK *vs.* H. F. MILLER *et al.*

Opinion filed November 21st, 1893.

**Agricultural Colleges—Trustees—Power of Executive to Remove.**

> The governor has no power, under Ch. 95 of the Laws of 1893, to remove the trustees of the Agricultural College and Experimental Station from office.

Appeal from District Court, Cass County; *McConnell*, J.

Action by the State of North Dakota, at the relation of R. M. Pollock and others, against H. F. Miller and others, to try title to office. From an order overruling their demurrer to the answer, relators appeal.

Affirmed.

*Wm. H. Standish, Atty Gen'l* and *M. A. Hildreth*, for appellant.

Chapter 124, Laws 1887 was repealed by the legislature of 1893. Chapter 95, Laws 1893, re-enacts § 4 Ch. 124 of the Laws of 1887. Chapter 124, Laws 1887 was construed by Judge Tripp in the Cox case 6 Dak. 501. The re-enactment of this statute after a judicial construction of its meaning is to be regarded as a legislative adoption of the statute as thus construed. Sutherland on Stat. Construction § 333 and cases cited. The power of removal from office when conferred upon the governor of a state is not a judicial power, it is a political and administrative or executive power. *Hawkins* v. *Governor*, 33 Am. Dec. 346; *Attorney General* v. *Brown*, 1 Wis. 442; *State* v. *Doherty*, 13 Am. Rep. 131; *Sutherland* v. *Governor*, 23 Mich. 320; *Wilcox* v. *Peo.* 90 Ill. 186; *Donahue* v. *County of Will*, 100 Ill. 94; *People* v. *Whitlock*, 92 N. Y. 191; *State* v. *Hawkins*, 5 S. E. Rep. 232; *South* v. *Commissioners*, 5 S. W. Rep. 567.

The defendants have had a hearing after notice, the executive has passed upon the sufficiency of the testimony, he has found cause for removal and the court will not inquire into the sufficiency of the finding. *State* v. *Johnson*, 18 L. R. A. 414; *State* v. *Hawkins*, 3 West. Rep. 125; *State* v. *Warmouth*, 2 Am. Rep. 712;

N. D. R.—28.

*Vicksburg, etc., R. R. Co.* v. *Lowry,* 48 Am. Rep. 76; *Peo.* v. *Stout,* 19 How. Pr. 171; *Sutherland* v. *Governor,* 29 Mich. 320, *State* v. *Peterson,* 52 N. W. Rep. 655. Official discretion when once exercised is not subject to review by the court. *State* v. *Carey,* 2 N. D. 36.

Removal from office, deprives no one of life, liberty or property, neither does it impair contracts or inflict punishments. *City Council* v. *Sweeny,* 9 Am. Rep. 171; *Shibenville* v. *Culp,* 38 Ohio St. 18; *Cohen* v. *Wright,* 22 Cal. 319; *Butler* v. *Pennsylvania,* 10 How. (U. S.) 402; *Connor* v. *Mayor,* 5 N. Y. 395; *Smith* v. *Mayor,* 37 N. Y. 518; *McVeany* v. *Mayor,* 80 N. Y. 190; *Farwell* v. *Rockland,* 62 Me. 296; *Donahue* v. *County,* 100 Ill. 94.

*Ball & Watson* and *Seth Newman,* for respondents.

Respondents, it is urged, are state officers within the meaning of § 196 of the Const., providing for the impeachment of "the governor and other state and judicial officers * * * "for habitual drunkeness, crimes, corrupt conduct or malfeasance or misdemeanor in office." The trial of such officers must be by the senate. Sec. 199 Const. The constitution having provided that state officers may be removed by impeachment by the house of representatives and trial before the senate setting as a court for certain specific cases. The enumeration of this method and these causes excludes all others. Cooleys Const. Lim. 4th Ed. 78, *Lowe* v. *Com.* 3 Metc. 241; *Brown* v. *Grover,* 6 Bush. (Ky.) 1; *Com.* v. *Chambers,* 1 J. J. Marsh 160; *Com.* v. *Williams,* 42 Am. Rep. 204; *State* v. *Gilmore,* 20 Kan. 551; Meachem Pub. Officers 452; Throop Pub. Officers 341. Removal for cause is removal upon notice, and full hearing, and a judgment determining the guilt of the accused, and is a judicial proceeding, and the power exercised is a judicial power, fit and appropriate to be exercised only by the courts under our constitution. Meachem Pub. Officers 455; Throop Pub. Officers 379; *Page* v. *Hardin,* 8 B. Monroe 672; 25 Am. Law Review 199; *State* v. *Pritchard,* 36 N. J. L. 101; *Dullam* v. *Wilson,* 53 Mich. 392; *Stockwell* v. *Township,* 22 Mich. 341; *Peo.* v. *Nichols,* 79 N. Y. 582; *Peo.* v. *Fire Commissioners,* 72 N. Y. 445; *Peo.* v. *Harmon,* 56 Hun. 469; Murdocks Appeal 7 Pick. 304, S. C. 12 Pick.

263; Matter of Nichols, 6 Abb. N. Cas. 474; *Andrews* v. *King*, 77 Me. 224.

The "public examiners act" under which appellant claims power to remove is unconstitutional because of defective title. *State* v. *Haas*, 2 N. D. 202; *State* v. *Woodmansee*, 1 N. D. 246. Removal from office being a judicial proceeding the statute must provide for notice and opportunity to be heard. *Stuart* v. *Palmer*, 74 N. Y. 183. Law not establishing proceedings for removal, notice etc. is void. *Kennard* v. *Louisiana*, 92 U. S. 480; *Foster* v. *Kansas*, 112 U. S. 201.

CORLISS, J. The contest in this case is over the title to the offices of trustee of the North Dakota Agricultural College and Experimental Station. The defendants, being in actual possession of such offices, are sought by this action, to be removed therefrom, and the relators ask at the same time that the right to hold and exercise the functions of such offices be adjudged to be in them, and that they be given actual possesion of the same. The issue of law before us was raised in the court below by demurrer to defendants' answer to the complaint. The demurrer was overruled, and the relators have appealed from the order overruling the demurrer. The question before us is therefore whether the answer states a good defense, in view of the averments in the complaint. It appears from the pleadings that the defendants had been duly appointed to the offices which they were holding, and that their respective terms of office had not expired. Whatever title the relators have to the offices rests upon the action of the governor in removing the defendants from such offices, and in appointing the relators to fill the alleged vacancy created by such removal. We are pointed to Ch. 95 of the Laws of 1893 as containing the grant to the executive of this power of removal. It is not controverted that the proceedings were in all respects in conformity with the provisions of this law. The only question is whether at the end of those proceedings the governor had the power to remove the defendants from office. We are therefore called upon to construe this act. The first section

thereof provides for the appointment of a state examiner. The next three sections bear so directly upon this question that we will quote them in full: "Section 2. The duties of the state examiner are to examine at least once every year the books and accounts of the secretary of state, state auditor, state·treasurer, clerk of the supreme court, commissioner of insurance, county treasurer, county auditors, and boards of county commissioners of each county, and such other county officers of any county, upon the request by the board of county commissioners. Section 3. It shall be the duty of the state examiner to assume and exercise constant supervision over the books and financial accounts of the several public, educational, charitable, penal and reformatory institutions belong to the state; to prescribe and enforce correct methods of keeping financial accounts of the said institutions by himself or a duly appointed deputy, and instruct the proper officers thereof in the due performance of their duties concerning the same; to examine the books and accounts of all public institutions under the control of the state, and of all private institutions with which the state has any dealing, once in six months. Section 4. It shall be his duty to order and enforce a correct, and as far as practicable, uniform system of bookkeeping [by state and county treasurers and auditors,] so as to afford a suitable check upon their mutual action, and insure a thorough supervision and safety of the state and county funds. He shall have full authority to expose false and erroneous systems of accounting, and when necessary instruct or cause to be instructed state and county officers in the proper mode of keeping the accounts. It shall be the duty of the state examiner to ascertain the character and financial standing of all present and proposed bondsmen of state and county officers. He shall require county treasurers as often as he shall deem necessary to make verified statements of their accounts and he shall personally or by duly appointed deputy visit said offices without previous notice to such treasurers, at irregular periods of at least once a year, or when requested by any board of county commissioners, and make a

thorough examination of the books, accounts and vouchers of such officers, ascertaining in detail the various items of receipts and expenditures; and it shall be his duty to inspect and verify the character and amounts of any and all assets and securities held by said officers on public account, and to ascertain the character and amount of any commissions, percentages or charges for services exacted by such officers without warrant of law. He shall report to the attorney general the refusal or neglect of state or county officers to obey his instructions, and it shall be the duty of said attorney general to promptly take action to enforce compliance therewith. He shall report to the governor the result of his examination, which shall be filed in the executive office, as well as any failure of duty by any financial officers, as often as he thinks required by the public interests, and the governor may cause the result of such examinations to be published, or at his discretion to take such action for the public security as the exigencies demand; and if he should deem the public interests require it, he may suspend any such officer from further performance of duty, until examination be had or such security obtained as may be demanded, for the prompt protection of the public funds." Section 5 relates to the fiscal affairs of counties, and the examiner is required to aid in any pending settlement, and is given full control of all books and records for that purpose. Section 6 makes it the duty of the examiner to visit once each year, without previous notice, "each of the bank, banking corporations and savings banks incorporated under the laws of this state; insurance, annuity, safe deposit, loan or trust companies and other monied corporations, and thoroughly examine into their affairs and ascertain their financial condition." His duties in this regard are set forth in detail, and the section closes in this language: "He shall forthwith report the condition of such corporations so ascertained, to the governor, together with his recommendations or suggestions respecting the same, and the governor may cause the same to be published, or in his discretion take such action as the exigences may seem to demand."

Section 7 requires all officers, state and county, and all officers and employes of the moneyed institutions mentioned, to aid the examiner in his investigations, by making returns and exhibits under oath, and makes it felony to refuse to do so when required, and makes it perjury to knowingly swear false concerning the same. Section 8 forbids any obstruction whatever of the examiner in the performance of his duties, and fixes the penalty therefor. Section 9 reads as follows: "Section 9. The state examiner shall report to the governor the result of his examinations on the first Monday in November of each year; he must also make a report upon any particular matter at any time when required by the governor and shall embody in such report an abstract of the condition and statistics of the several state institutions, and the county and state finances ascertained by him, which report shall be printed to the number of 500 copies and shall be included with other official reports in the volume of executive documents." The two remaining sections need not be noticed.

A casual examination discloses the fact that this statute is somewhat disconnected, crude, and incomplete; yet its construction is not difficult. The particular language which it is claimed confers this power of removal is found in the last portion of the fourth section, and is this: "He [the examiner] shall report to the governor the result of his examination, which shall be filed in the executive office, as well as any failure of duty by any financial officers, as often as he thinks required by the public interests, and the governor may cause the result of such examinations to be published, or at his discretion to take such action for the public security as the exigencies demand." We expressly refrain from expressing an opinion as to whether or not this language confers upon the governor the power of removal of any officer under any circumstances. A decision of such a question is not necessary to the decision of this case. Conceding, for the purposes of this case, that the contention of the relators that this ambiguous language vests the power of removal in the governor

so far as it embraces the officers to which it relates, we are clearly of the opinion that it does not relate to the officers of the various public institutions specified in § 3. We are met at the outset with the claim that contemporaneous construction of a similar statute has practically foreclosed our independent interpretation of the meaning of this law. We find nothing in the history of this State or the Territory of Dakota, so far as this and similar legislation is concerned, to warrant this claim. We in no respect retract any of the utterances of this court with reference to the force of contemporaneous interpretation of statute law. But we are clear that so extraordinary a power as that of removal from office without notice, without hearing, and without the existence of any legal cause (for removal for, under the terms of statute, the power conferred is subject to no limitation or condition) cannot be vested in the executive office by a single claim to the right to exercise such power with respect to officers of public institutions, made by the governor himself, when such claim, so far from being acquiesced in, was promptly challenged in the court Subsequently to the removal of the trustees of the Yankton Asylum by Gov. Church of the Territory of Dakota, no governor of the Territory or of the State of North Dakota had attempted to exercise such power before Gov. Shortridge attempted to remove the defendants in this case from their respective offices of trustees of the Agricultural College. We have referred to this power of removal as extraordinary, because, if it exists with reference to the officers of the various public institutions of the state, there is no limitation to it in the statute, and no right, under the terms of the statute, in the officer removed, to demand a specification of the grounds of his removal, or be heard at all in his defense. By the terms of the statute the action of the governor may immediately follow the filing of the examiner's report without notice to the officer, although his term has not yet expired. It is due to the governor to state that the facts of this case disclose the utmost fairness on his part in giving notice to the defendants, and in granting them a hearing, although the statute neither directly

nor by implication requires either notice or hearing to precede the contemplated action of the executive.

It is further urged that, at the time Ch. 95 was adopted by the legislature of this state, it had, so far as this question is concerned, received a construction by a District Court of the Territory of Dakota favorable to the relators, and that, therefore, the legislature must be presumed to have enacted it in the light of such interpretation, and with the purpose of having it incorporated in, and form a part of, the act itself. There are two answers to this contention. The decision which construed Ch. 124 of the Laws of 1887 was not the decision of the court of last resort. It was a *nisi prius* decision. See *Territory* v. *Cox*, 6 Dak. 501. We know of no case holding that such a construction of a statute is controlling, within the rule which incorporates in an act taken from another jurisdiction the settled construction thereof in such jurisdiction as the time it was enacted. But, in addition, we find that very material changes have been made in the law. The act of 1893 differs in several important particulars from the act of 1887, as will hereafter be shown. The section of Ch. 95 which it is insisted vests in the governor the power of removal is § 4. The section which declares it to be the duty of the examiner to examine the books and accounts of the public institutions of the state is § 3. Of course, the mere fact that the language which it is claimed gives the governor power to remove is not found in the same section which makes it the duty of the examiner to examine the books and accounts of the public institutions is not necessarily of controlling weight. The question still remains, what matters had the legislature in view when they conferred the alleged power upon the governor? This necessitates an analysis of § § 3 and 4. Section 3 makes it the duty of the examiner, among other things, to examine the books and accounts of all public institutions under the control of the state. This section is silent as to what is to be done with any report which the examiner shall make of the result of his examination. Indeed, it nowhere requires him to make any report at all of such examination. But

§ 9 declares that the examiner shall report to the governor the results of his examinations on the first Monday of November of each year; and this report, the section provides, shall be printed to the number of 500 copies, and shall be included with other official reports in the volume of executive documents. We have in this section a clear statement as to what shall be done with the report of all examinations, including examinations of public institutions. But this section does not contemplate nor authorize such action by the governor upon such report. The only sections which provide for any such action are § § 4 and 6. But it is not claimed that § 6 confers power of removal on the governor. We are left, then, to the construction of § 4 to settle the question. So far as this section provides for the making of any examination of the books and accounts of any public officers, it relates exclusively to financial officers. "He shall require county treasurers as often as he shall deem necessary to make verified statements of their accounts, and he shall personally or by duly appointed deputy visit said offices without previous notice to such treasurers, at irregular periods of at least once a year, or when requested by any board of county commissioners, and make a thorough examination of the books, accounts and vouchers of such officers, ascertaining in detail the various items of receipts and expenditures; and it shall be his duty to inspect and verify the character and amounts of any and all assets and securities held by said officers on public account, and to ascertain the character and amount of any commissions, percentages or charges for services exacted by such officers without warrant of law." After a provision having no relation to this question, the section continues: "He shall report to the governor the result of his examination, which shall be filed in the executive office, as well as any failure of duty by any financial officers as often as he thinks required by the public interests, and the governor may cause the result of such examinations to be published, or at his descretion to take such action for the public security as the exigencies demand; and if he should deem the public interests require it, he may suspend

any such officer from further performance of duty, until examination be had, or such security obtained as may be demanded, for the prompt protection of the public funds." It will be noticed that the word "examination" is in the singular number. It clearly refers to the examination already mentioned in the section *i. e.* the examination of the books, accounts, and vouchers of county treasurers. He is to report the result of this examination, and also the failure of duty of any financial officer, and thereupon the governor is, at his discretion, to take such action for the public security as the public exigencies demand. He is not to take such action when any report is filed, but only when the report mentioned in § 4 is made and filed,—*i. e.* a report as to the condition of the public funds in the hands of county treasurers, and the failure of any financial officer to perform his duty; and, to emphasize the view that the governor is to take action on the coming in of only reports as to financial officers, it is provided that he shall take such action for the public security as the exigencies demand. There is not a syllable in this section to indicate that the legislature had any other purpose than to guard the public funds against the dishonesty of financial officials when they conferred this general discretionary power on the governor. It is in such cases that he is to act for the public security. Whatever report he makes with reference to public institutions is required to be made, not by § 3 or § 4, but by § 9, and § 9 declares what shall be done after such report is made and filed. It shall be printed and included with other official reports in the volume of executive documents. It is a most strained construction which would include a report of the examination of public institutions in the words found in § 4, "He shall report to the governor the result of his examination," in view of the fact that the section refers to a distinct examination of the books, accounts, and vouchers of county treasurers; and these words immediately follow the provisions as to the making of such examination, and are in no manner connected with the examination mentioned in § 3. Section 9 gathers up in one report all the results of the examina-

tions made during the year. This report is to be filed and included with other official reports in the volume of executive documents. This is what is to be done with the result of the examination as to public institutions, and this is all that is to be done. No other report of such matter is comtemplated.

We come now to the change which has been made in the statute. Section 2 of Ch. 95 of the Laws of 1893 is not to be found in Ch. 124 of the Laws of 1887. This section makes it the duty of the examiner to examine, at least once a year, the books and accounts of several state, as well as county, officers. No argument can be made in favor of the position that the language of § 4, conferring power upon the governor, is applicable to the public institutions mentioned in § 3, which cannot with equal force be employed to show that this same language is applicable also to the officers mentioned in § 2. If then, the legislature literally intended to vast the power of removal of the officers of public institutions in the governor, it intended to vest in him the power to remove the state officers mentioned in § 2. But this would render the law to that extent unconstitutional. State officers can be removed from office only by impeachment. The legislature cannot vest in the governor the power to remove them from office for any cause. Const. § § 196, 197. Had Chief Justice Tripp, in the Yankton Asylum Case, ( *Territory* v. *Cox,*) been compelled to impute to the legislature the intent to violate a constitutional provision in order to place upon the statute the construction he placed upon it in that case, he would never have reached the conclusion that he did. He would not have strained the language of § 4 only to reach the conclusion that the legislature had attempted to disregard the plain language of the constitution by essaying to confer upon the governor the power to remove a state officer. Sections 2 and 3 stand, under the terms of statute, upon the same footing with respect to the alleged power of removal. If it is not conferred in § 4 with respect to the officers mentioned in § 2, neither is it conferred with respect to the officers of the public institutions mentioned in § 3. Nor are

we satisfied with all the reasoning of the able and distinguished judge who decided the Yankton Asylum Case. He finds strong support for his position in that clause of § 4 which reads, "as well as any failure of duty by any financial officers." He argues from this that the prior provision which requires the examiner to make a report of his examination does not refer to financial officers. Otherwise, he inquires, why declare, in addition, that he shall also report any failure of duty by any financial officers? The answer seems obvious to us, without reaching the conclusion to which he felt impelled by this provision. The report which is referred to at first is a report of the examination of the books, accounts, and vouchers of county treasurers alone. There were other financial officers in the state, and therefore the examiner is to report, not only as to the dereliction of duty of county treasurers, but as well the failure of duty of any financial officers. Had not this clause been added, there would have been no power in the governor to act with reference to such officers; and it was therefore inserted to make the statute efficacious for the protection of all the public funds in the hands of all financial officers, and not merely those in the hands of county treasurers. Counsel for appellant did not realize to what position they would be driven by this contention that the legislature intended that the act of 1893 should be construed in accordance with the decision in the Yankton Asylum Case. If the legislature intended to adopt this construction in one respect, it follows that they intended to adopt it in its entirety. The words, "or at his discretion, to take such action for the public security as the exigencies demand," were construed in that case to vest in the governor the power of removal, and no other power. At page 518 of the opinion, Tripp, C. J., says: "That these words could have no other meaning than removal we have already seen." These same words occur in § 6 of the act of 1893, which makes it the duty of the examiner to examine all banks, banking incorporations, and savings banks, and also insurance, annuity, safe deposit, loan, or trust companies, and other moneyed corporations, and to make a report to the governor of

the condition of such corporations. Will it be seriously urged that the governor, under this same language, when used in this section has no other power than the act of the removal of the officers of such corporations, and that he actually has such power of removal? It is too clear to be controverted that the governor could not remove the officers of the private corporations mentioned in § 6. Were the legislature so anxious to set the seal of their approval upon the ruling of Chief Justice Tripp that they were willing that the language used by them in § 6 should have no significance, rather than they would mean anything different from the judgment of that court as to their true construction?

It is insisted that, unless the power of removal exists, the work of the examiner is futile, and the statute is stripped of its efficacy, so far as the public institutions are concerned. This reasoning loses sight of the fact that the conciousness of a public official that his conduct is constantly watched by the examiner will deter him from attempting to violate his trust. The chances of detection are greater, discovery of dishonestly will follow more closely the dishonest act, and the proof will be more easily attainable, because the examiner has full power to examine into all matters which could be ascertained only with great difficulty were there no one vested with authority to look into the officer's books and accounts. As a result of such examination, proceedings may be instituted in court, under the statute to remove the unfaithful officer, or he may be indicted. See, as bearing upon the question of removal by proceedings in court, § § 1387 to 1391, both inclusive, and § § 7080 to 7095, both inclusive, of the Comp. Laws. Were it not for constant supervision by the examiner, many officers would be able to conceal their official delinquencies until their terms of offices had expired. If the examiner performs his duty, wrongdoing in office will be speedily detected, and removal from office by proceedings in court under the statute will follow.

Several interesting canstitutional questions were discussed in the argument. But the views we entertain as to the construction of the statute render it unnecessary that we should settle them in

this case. We are unwilling to pass upon them until compelled to do so, as they relate to the power of the executive, under our constitution, to remove from office, and also to the power of the legislature to confer upon him the power of removal. The relators must fail, because the executive cannot destroy the title of defendants to the office, and has no power to appoint the relators to such office, there being no vacancy. *State* v. *Boucher*, (N. D.) 56 N. W. 142.

The order of the District Court is affirmed. All concur.
(57 N. W. Rep. 193.)