STATE *ex rel.* HOLMES, State's Atty. v. SHANNON.

1. Chapter 124, Laws 1887, being section 117 et seq., Comp. Laws, and known as the "Public Examiners' Act," providing that upon the filing of a report of his examination, as required by said law, with the governor, he, the governor, "may cause the results of such examination to be published or at his discretion, to take such action for the public security as the exigency may demand; and if he should deem the public interests to require, he may suspend any such officer from further performance of duty until an examination be had, or such security obtained as may be demanded for the prompt protection of the public funds,"—was not intended to, and does not authorize the governor to remove from office any officer so made the subject of the examiner's report.

2. Even if such law were originally intended to authorize the governor to so remove from office at his discretion, the law in that respect and to that extent is inconsistent with, and therefore abrogated by, section 4, art. 16, of the state constitution.
   FULLER J., dissenting.

              (Syllabus by the Court.   Opinion filed Aug. 15, 1895.)

    Original action in the nature of *quo warranto* judgment for defendant.

    The facts are stated in the opinion.

    *Coe I. Crawford,* Atty. Gen. and *John A. Holmes,* States' Atty., Hughes county (*Horner & Stewart* of counsel) for plaintiff.

    *Aplin & Lynch* (*C. S. Palmer* and *Robert Dollard,* of counsel) for defendant.

    KELLAM, J.   This is an action by the state in the nature of *quo warranto;* brought in this court, to test the right and authority of defendant, Shannon, to hold the office of regent of education, the governor having theretofore issued and served upon him his executive order of removal from such office, by virtue of the power conferred upon him by Chapter 124, Laws 1887, being section 117 *et seq.,* Comp. Laws, and known as the "Public Examiners' Law."   Upon the commencement of the suit this court issued an order to show cause why defendant, Shannon, should not be restrained from acting as such regent pending the trial of the ques-

tion of his right so to do. Upon the return and hearing of such order, defendant demurred to the complaint for insufficiency, thus bringing before the court the question of the power of the governor under such law to make such removal. Without further statement of the facts, but merely premising that the obvious importance and almost necessity of an immediate decision of the question involved preclude the preparation of a properly formulated opinion, we shall attempt little more than a statement, without elaborate argument or array of authorities, of the principal reasons which influence and control our conclusions.

The attorney general, as counsel for the state, adopts the argument and conclusion of Chief Justice TRIPP in Territory v. Cox, a *nisi prius* decision published in the appendix to 6 Dak. 501. It would certainly be supererogatory for the writer of this opinion to say that no words of his would add to the high estimation in which the legal utterances of Judge TRIPP are held by the bench, the bar, and the people of this state, but it is significant that the learned judge himself has "some doubt" as to the correctness of his view of the immediate question involved, and reaches and states his conclusion with "some hesitation." He says: "That this power of removal is an executive one, and that it may properly be left with the executive officer of the territory, I have no doubt; but whether it was the intention of the legislature to authorize, and whether it has authorized, the use of such power by the executive, I have some doubt." Again he says: "I am constrained, after much study and with some hesitation, to adopt the construction that the legislature intended to authorize the governor to exercise all and every of his executive power in enforcing this examiners act." Entertaining this frankly confessed doubt as to what the legislature intended by this law, Judge TRIPP very properly, we think, concluded that he ought to resolve the doubt in favor of the construction given to the law by the executive, and did so.

If the meaning of the law is ambiguous and its intent doubtful, we must resort to all legitimate means to ascertain what the

legislature did intend, for when we find the intent we have found what the law is. In this country the rule is practically universal that every law has a title. By it the general scope and ultimate purpose of the law itself is indicated. So important is the title of a law that most state institutions require such title to embrace the subject of the law itself, and invalidate such portions of a law as are not so embraced in the title. In case the body of a law leaves its intent in doubt, its title may and should always be resorted to, as an aid in discovering what was in the legislative mind. Suth. St. Const. § 211. The law under consideration was passed in 1887. Its title is: "An act to create the office of public examiner, defining the duties and dividing the territory into two examiner's districts." We are not now questioning the validity of this law, because repugnant to the provisions of our subsequently adopted constitution, but are simply looking at the title, to ascertain, if possible, what kind of a law the legislature thought it was enacting. Would any member of the legislature or any constituent expect to find under this innocent title, general authority conferred upon the governor to remove, at his discretion and without notice, two-thirds of all the officers in the state, whether constitutional or statutory, elective or appointive? Here and elsewhere we speak of the legislature "conferring or bestowing power upon the executive" rather for facility than accuracy of expression. Such a bestowal of almost unlimited power upon the governor would be unusual, and an extraordinary event in legislation; and we think it not unreasonable to presume that, if the legislature intended to invest the governor with such power, it would have given the law itself a more suggestive title than that of a bill for the appointment of public examiners. The duties of the examiner are carefully defined in a half-dozen long and perspicuous sections, but these, it would seem are only preliminary to the incomparably more important power conferred upon the executive in a half-dozen well-sounding words. which Judge Tripp, as already seen, concedes to be of doubtful meaning and intent.

It is also a cardinal principal of statutory construction that to ascertain the meaning of a doubtful phrase or provision,

other parts of the same law may and should be considered (Suth. St. Const. § 215.), and that words and phrases repeatedly used in the same statute will bear the same meaning throughout, unless a different intention clearly appears (Id. § 255). The governor's power of removal is found, if at all, in section 4 of the law. This section makes it the duty of the public examiner to order and enforce a correct and uniform system of bookkeeping by territorial and county treasurers and auditors; to expose false and erroneous systems among such officers, and to ascertain the character and financial standing of all present and proposed bondsmen of territorial and county officers; to examine the books, accounts and vouchers of such officers, as well as the character and amount of securities held by them on public accounts, and the character and amount of any commissions, percentages, or charges for services exacted by such officers without warrant of law. The result of such examination is to be reported to and filed with the governor, and then follow the words in which is found the governor's power of removal. They are: "The governor may cause the results of such examinations to be published, or at his discretion to take such action for the public security as the exigency may demand." Now, compare this section with section 5 of the same law. That section requires the public examiner annually to visit each of the banks, insurance companies, and moneyed corporations of his district, and thoroughly examine into their affairs and financial condition; to inspect and verify the validity and amount of their securities and assets; to inquire into any infringement of the laws governing such companies or institutions. He is to make a report of the results of such examinations to the governor, and then, as in section 4, "the governor may cause the same to be published, or in his discretion take such action as the exigencies of the case may seem to demand." If these very words, when used in section 4, mean that the governor may deprive any such officer of his office, then what do the same words mean when used in this section 5? Can the governor, if he thinks "the exigencies of the case may demand it," remove any or all of the officers of the bank

or insurance company which is the subject of the examiner's re-
port, or may he annul its charter, or declare its franchise forfeited,
or compel it, by his executive order, to cease doing business?

It would be impracticable here to enumerate the particular
things he might do under this authority, but, in our judgment, they
could only be such acts as related to the curing of irregularities in
their methods of business, and enforcing upon such institutions
and their officers an observance of the laws governing the same.
In the exercise of such power the governor would have and might
properly exercise a wide discretion, but if, in his judgment, "the
exigencies of the case" demand the severe and extreme remedy of
deprivation of official or corporate functions, we think, if well ad-
vised, he would report the same to the attorney general, or some
state's attorney, for such action as would judicially test the ques-
tion of forfeiture for misconduct. To our mind, it is no answer to
this suggestion to say that such a construction would add nothing
to the power of the governor, for he could do this even if the law
did not authorize him to take such action as the exigency of the
case demanded, because it would be the general right of any citizen
of the state to do it. Such argument, to be of any force, must be
based upon the assumption that the primary design of this law was
to increase the power and authority of the governor, when, to us at
least, it seems plain that its purpose was entirely other and differ-
ent, and that the power conferred upon him is only subsidiary and
incidental to aid in enforcing correct and legal business methods
and practices in these institutions, for the protection and security
of the public.

Returning to Section 4, we would give these words the same
construction and legal effect. Here again it is claimed that these
words are meaningless unless they confer the power to remove from
office, and here again we say that every provision and line of the
law declares its general purpose to hunt out and correct irregular-
ities, bad and unsafe methods, and abuses in the conduct of public
business by the officers referred to. The public examiner is only
required to be a "skilled accountant" and an "expert in the theory

and practice of bookkeeping." He may have little knowledge of affairs generally, and little judgment as to what would, in any particular condition of things, best promote the public security, and so the law requires him to report what he finds to the chief executive of the state, and he may, within the scope of his power, act as his judgment dictates. He may publish or he may decline to publish. He may call upon any such officer for explanation of any act or practice so called to his attention, or if, in his opinion, it is unimportant, he may ignore it. If in doubt as to the legality of any such act or practice, he may seek the advice of the attorney general with a view of determining what he ought to do in the premises, if anything. He may call for further security on treasurer's bonds. It seems to us that these are fair illustrations, and that many other things will readily occur to any one as embraced in and naturally suggested by the words of this section. If, however, he deem the case sufficiently flagrant and dangerous to public interests, he may and should report the same to the attorney general, or the proper state's attorney, for such action as the law authorizes. The purpose of this law, in our opinion, is to bring these bad and dangerous business methods to light, and to place in the hands of the chief executive of the state such facts and information as will enable him to investigate, and, if found to be substantial and dangerous, see that a proper remedy is applied. The power of the governor under it is precisely the same as would have been that of the auditor of state if it had been provided that these reports should be filed in his office, and that he should act upon them as in his discretion the exigency of the case might demand. And it now occurs to us that, with reference to insurance companies and other institutions over which he has a direct supervision, there would have been no incongruity in conferring the power covered by these words upon the auditor, and nobody would have suspected that it was an attempt by the legislature to confer upon him the extraordinary power claimed to have been given the governor by the same words.

Section 7080 et seq., Comp. Laws, provides how any county, township, city, or municipal officer may be removed for willful or

corrupt misconduct in office. By Section 7092 the same proceed-
ings are made applicable to any territorial officer, whether elected
by the people or appointed by the governor, "except delegates to
congress and members of the legislative assembly"; and by Section
7095 the same proceedings are applicable to just the case before us,
if we understand the accusation, the "charging and collecting ille-
gal fees for services rendered." . Suppose this defendant regent
were indicted for the precise act which is the basis of the gover-
nor's action. His trial results in his vindication and acquittal,
but, under the construction claimed for this law, such acquittal
would in no degree stand in the way of his removal by the gover-
nor, if, for any reason, he deemed the public interests to require it.
We are not now contending that the legislature could not have au-
thorized such action on his part, but we cannot rid ourselves of the
conviction that if they had so intended they would have said so in
terms something like those they have usually employed in confer-
ring the power of removal. My own views of what the legislature
intended by these words are confirmed by what immediately fol-
lows them in said Section 4. They are: "And if he should deem
the public interests to require, he may suspend any such officer
from further performance of duty, until an examination be had or
such security obtained as may be demanded for the prompt protec-
tion of the public funds." If the preceding words had already em-
powered him to do anything he thought the exigency of the case
demanded, even to the absolute and unqualified removal of such
officer, I am unable to understand why it should have been thought
necessary to specifically provide that he might temporarily suspend
such officer. If the power of the governor had been expressly "to
remove from office," there might have been reason for adding the
power to suspend; but where, as here, the power to remove is drawn
from the general authorization to do, in his discretion, whatever he
deemed the exigency to demand, there would seem to be no reason
for expressly mentioning a lesser thing already included in the
greater. My understanding of the meaning and power of these
words would be that the governor, in addition to such action as he

would ordinarily take under the circumstances, in investigating alleged irregularities, calling negligent or uninformed or perhaps willfully perverse officers to account, or in generally taking such prudential, preventive, or remedial steps in any particular case as would in his judgment conserve the public interests, by correcting the erroneous methods or the illegal or unsafe practices reported, might, if he should deem the public interests to require, temporarily suspend any such officer.

Another fact which might have some weight with us in determining this particular case, even if we could assent to the claim that the quoted words were intended to confer the power of removal upon the governor, in this: The case, if covered by the act at all, arises under section 3, the defendant being one of the regents of education in control of the educational institutions of the state. Section 3 relates to the books, accounts, and expenses of the educational, charitable, penal, and reformatory institutions of the state, and does not contain the words or any words claimed to confer the power of removal upon the governor. Section 4 relates to county treasurers and auditors, and does not contain the words claimed to confer such power. Section 5 relates to banks, insurance and other moneyed corporations, and contains the same words with regard to the general power to remove as secton 4. In the Cox case, Judge TRIPP found no serious difficulty in making the concluding portion of section 4 apply also to section 3, but is not the difficulty somewhat increased when, in a law containing three separate sections, each covering distinct and independent ground, two of such sections expressly confer a power upon the governor to be exercised in regard to the subject-matter of that section, but concerning which the other section is entirely silent? The fact is conspicuous, if not suggestive. We do not, however, pursue this inquiry further, for we feel well established in our opinion that the words hereinbefore so often quoted from said sections 4 and 5 were not intended to, and therefore do not, confer the power of removal from office. If they do, the power so conferred may be exercised summarily, without any notice to the

officer accused, and without any opportunity to be heard in his de-
fense.    It may be exercised for an alleged misconduct for which
the accused officer has already been tried and judicially acquitted.
It is not remarkable that whenever, in any other case, the legisla-
ture has intended to authorize the exercise of such extraordinary
power by the governor, it has so declared in plain, certain and un-
mistakable terms, and not left it to be inferred from general lan-
guage whose intent and scope are conceded to be doubtful.   We
ought probably to say, in justice to the governor, that in this case
ample notice and opportunity to be heard were given to defendant.
But this was entirely voluntary and gracious on the part of the
executive.    The law does not require it, and, if the power of re-
moval is conferred by law, his act of removal would be equally le-
gal and operative if it had been summary and without notice to
defendant.    The construction of this law and its legal effect, and
particularly of section 4, in which the language first occurs under
which the power of removal is claimed, are very ably discussed by
Judge CORLISS in State v. Miller, 57 N. W. 193.    While that court
expresses no opinion upon the question whether such language
confers upon the governor power to remove the officers mentioned
in such section, it unhesitatingly concludes that it gives no au-
thority to remove officers named only in section 3.    This conclu-
sion, if followed, would, of course, determine this case; but we are
disposed to go a step further; and are satisfied to put our decision
on the ground that the law was not intended to, and does not, invest
the governor with the power to absolutely and permanently remove
from office.    This "Public Examiners' Act" was, as Judge TRIPP ob-
serves, taken from Minnesota.    It was there passed in 1878.    That
the legislature of that state did not in 1881 understand that the act
in question authorized removal by the governor is evident from the
fact that in that year the legislature passed a law (chapter 108 of
the laws of 1881) expressly authorizing the governor, in case it
should appear from the public examiner's report that any county
treasurer had been guilty of malfeasance or nonfeasance in the
performance of his official duties, to cause to be made a thorough

examination of the facts, and, if he found such charge sustained, to remove such treasurer from office. If he already had the power under the law of 1878, why was it necessary to duplicate such authorization by another law in 1881? In March, 1892, the governor of that state removed from office the county treasurer of Hennepin county. The state brought quo warranto proceedings to oust such deposed officer. See State v. Peterson, 50 Minn. 239, 52 N. W. 655. The quesiton of the executive power of removal turned entirely and exclusively upon the legal effect of said law of 1881. It apparently never occured to the council on either side, or the court, that the power of removal could be found in the prior law of 1878. Or if, as claimed here, general power to remove was embraced in the law of 1878, how is it accounted for that a further and subsequent law was necessary to particularly authorize the removal of a county treasurer? It could not have been done inadvertently, for the public examiner's law and his report under it are made the basis of the governor's action; so that it is plain that that law was in the legislative mind when it passed the subsequent law of 1881.

So far we have discussed this question only as one of the actual intent of the territorial legislature in enacting this law, and its legal effect when passed. There is, however, another view of the question, under present conditions, which we should feel obliged to very seriously consider, even if we entertained different views upon the question of the original legislative intent. Since the passage of this law, the form of our government has been radically changed, and a constitution has been substituted for the organic act of the territory as the fundamental law of the present state. Whatever territorial laws were repugnant to positive provisions of the constitution became at once superseded or repealed. The constitution constitutes a limitation of the powers of the state and of its several departments. Section 4, art. 16, of the constitution, is as follows: "All officers not liable to impeachment shall be subject to removal for misconduct or malfeasance, or crime or misdemeanor in office, or for drunkenness, or gross in-

competency, in such manner as may be provided by law." In this section is plainly enumerated the causes for which the legislature can by law authorize the removal of such an officer as is contemplated by this section.

It is not worth while now to stop to discuss the question whether the legislature can itself create a new office, and, having authorized the governor to fill it, may empower him to remove the incumbent at his pleasure; for the defendant is not such an officer, or claiming the right to such an office. The office of regent of education is a constitutional office, with a fixed term, and. defendant, as such, is one of the officers referred to in said section. The legislature can no more add other causes for the removal of such an officer, or make his removal discretionary without the existence of one or more of these named causes, than it can authorize the impeachment of the governor for cause other than is named in section 3 of the same article, or make his impeachment discretionary with the senate. By expressly enumerating the causes for which such an officer may be removed, the constitution not only limits the causes, but limits removals to cases where such causes exist. We must not be understood as saying or meaning that such cause must first be judicially declared to exist before any power of removal can be exercised, but we do mean to say that the constitution plainly and unmistakably does forbid the removal of such an officer at the pleasure of anybody, whether governor, legislature, or court. It not only projects a theory, but it declares a rule, and establishes the plan that constitutional officers, at least, unless otherwise provided in the constitution, do not hold their office during the will or pleasure of any officer or department of state. The public examiners' law, if it contains the power of removal at all, authorizes the governor to exercise it in the case of any constitutional officer not liable to impeachment, not for any of the causes named in said section 3, but in his discretion, if in his opinion, the exigency of the case demand. While this court expressly disavows any suspicion that the present governor would undertake to exercise the power, except he honestly

thought the exigency of the case did require it, the constitution
does not allow him or the legislature to substitute his unlimited
discretion for the causes named in said section 3. The law does
not in any manner make the governor's action depend upon the
character of the examiner's report. It is only necessary that he
should make a report of some kind, and, whether culpatory or
commendatory, the governor is then authorized to act in his dis-
cretion as the exigency demands. As said by Judge TRIPP in the
Cox Case, "he is made sole judge of the exigency"; and thus his
individual.judgment, and not the constitution, determines the con-
dition under which, and the cause for which, removal from office
may and should be made.

It may be suggested that the court ought not to presume that
the governor would act arbitrarily or unreasonably, or without
constitutional cause. The answer is that we are not in any sense
reviewing the action of the governor. We are simply looking at
the law itself, and comparing it with the constitution; and if it at-
tempts to authorize what the constitution forbids, it is so far in-
operative and null, whether such repugnant provisions are ever
sought to be acted upon or not. The test of the validity of the
law is not what has been done under it, but what may
be done under it. If in his judgment, the exigency of the
case demand it, the governor may remove as well for a
cause not named in the constitution as for the first, or any
other one therein named, and thus the law would, under the con-
struction claimed, enlarge and amplify the causes for removal rec-
ognized by the constitution and limit and measure them only by
the individual judgment of whomsoever happens to be the gover-
nor of the state. If, as is claimed, such discretion includes the
right to remove the law seems to us to be in plain defiance of the
constitutional provision cited, and to the extent that it is so, would
become inoperative when the superior law of the constitution took
effect.

Other questions going to the merits of the controversy and
the character of the act alleged as the cause for the governor's

order of removal were discussed upon the argument, but in the view we have taken of the fundamental question of the power itself, other questions will not be noticed. The temporary restraining order is dissolved.

FULLER, J. (dissenting). I dissent. In my judgment, Chief Justice TRIPP has rightly interpreted all statutory provisions essential to a determination of this case, none of which are abrogated by the constitution. I unhesitatingly accept as logical the reasoning of that eminent jurist in the case of Territory v. Cox, 6 Dak. 501, and fully coincide with the views therein expressed.